**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Steven G. WITHERSPOON, Appellant.**

Superior Court of Pennsylvania.

Submitted Feb. 16, 1999.

Filed April 13, 1999.

Joseph K. Cottrell, Williamsport, for appellant.

Michael A. Dinges, Assistant District Attorney, Williamsport, for appellee.

Before KELLY, J., CERCONE, President Judge Emeritus, and OLSZEWSKI, J.

OLSZEWSKI, J.:

¶ 1 Appellant, Steven Witherspoon, was convicted at bench trial of simple assault. We reverse.

¶ 2 Witherspoon ran an amateur boxing camp for disadvantaged youth and made extensive use of volunteer trainers and assistants. Shortly after he enrolled his two sons in the program, Mark Saldivar, Sr. asked to volunteer and Witherspoon placed him in charge of supervising youths that were practicing their sparring skills. Soon after assuming his duties, however, Saldivar ridiculed a child for not following his instructions and Witherspoon pulled him from the task, suggesting that he did not possess the right temperament for dealing with troubled youth. Thus began the series of events that led to appellant's conviction for simple assault.

¶ 3 The record of testimony, accepted as credible by the trial court, shows that Saldivar left after arguing over whether Witherspoon believed the word of a child over that of an adult. The evening of the following day, Saldivar appeared at Witherspoon's home, banging on the door and cursing loudly to get Mrs. Witherspoon's attention. Mrs. Witherspoon asked Saldivar inside, but he demanded that Witherspoon step outside and settle their differences in a fight. Saldivar then leaped off the front porch and fled once Witherspoon came outside.

¶ 4 The following day at boxing camp, Witherspoon gathered the kids around and offered a public apology to Saldivar for creating an issue out of his treatment of the child a few days earlier, and promised to let Saldivar again volunteer as an aide. Hands were shaken and all the problems seemed to be resolved. But the issue arose again the next day. Saldivar arrived at the camp and asked, "what's my new job?" Witherspoon gave him the job of timing the sparring events with a stop-

watch, which Saldivar began doing. After about half an hour, however, Saldivar chaffed at doing such a menial task, and retired to the bleachers. While self-exiled to the bleachers, Saldivar chaffed himself some more and within another half-hour returned to the floor and started castigating Witherspoon for "[taking] the kid's word."

¶ 5 At this point, Witherspoon asked Saldivar to leave. Saldivar refused to leave, and continued arguing loudly with Witherspoon. Witherspoon then asked one of his trainers, Mitch, to escort Saldivar from the building. Mitch grasped Saldivar by the shoulders but Saldivar spun free from Mitch's grasp and lunged at Witherspoon. Witherspoon slapped Saldivar with his open left hand along the right cheek, and Saldivar went down for the count. Saldivar was taken by ambulance to Williamsport Hospital, where he created a disturbance because he was unsatisfied with the priority his treatment was being given by hospital personnel. He was then sent to Geisinger Hospital where he was diagnosed with a broken jaw and was treated. Witherspoon was charged with Simple Assault and Harassment.

¶ 6 On appeal, Witherspoon asserts that the trial court erred in finding that the Commonwealth adequately disproved his self-defense theory. We agree.

¶ 7 In its case-in-chief, the prosecution presented the testimony of three witnesses: Saldivar and his two sons Mark Jr. and Sam. In essence, Saldivar alleged that Witherspoon punched him with a closed fist from behind as he was walking away from a confrontation. The two sons corroborated this testimony. The trial judge, however, specifically stated on the record that she did not find the Commonwealth's witnesses credible. She noted that the injury was consistent with an open-handed slap. N.T. 12/29/97, at 85. She also expressed her belief that Saldivar had talked to his sons about his version of the events and influenced their testimony. N.T. 12/29/97, at 83–84. In summation,

the court found that "I don't believe [Saldivar's] back was toward [the defendant]. I don't believe that factual scenario at all." N.T. 12/29/97, at 85.

¶ 8 In contrast, the trial court gave credence to appellant's witnesses. These witnesses included the investigating police officer, Witherspoon's wife, and Witherspoon himself. In finding Witherspoon guilty of simple assault, the trial judge relied on Witherspoon's own testimony that he struck Saldivar. The judge, however, also ruled that Witherspoon was not justified in his belief that he was in immediate danger:

> Instantly, the Court found that the Defendant intentionally caused bodily injury to Mr. Saldivar. The Defendant admitted that he raised his open hand and smacked the victim on the right side of his jaw. Although the defendant argued that he only raised his hand in self-defense, the Court finds that the Commonwealth proved beyond a reasonable doubt that the defendant did not reasonably believe he was in danger of death or serious bodily injury.... The Defendant testified that Mr. Saldivar turned toward him with his hands raised in a fighting position, yet Mr. Saldivar hadn't tried to swing at or strike the Defendant. Additionally, the Defendant testified that he had been confronted by Mr. Saldivar the night before when he had come to the Defendant's house and asked to fight. When actually put in a direct confrontational situation, however, the Defendant testified that Mr. Saldivar jumped off the porch and had backed away.

> Furthermore, the defendant was surrounded by his friends who were alerted and ready to intervene should a confrontation arise. One of the men was, in fact, escorting Mr. Saldivar to the door when the assault occurred. After a review of the circumstances surrounding the assault, the Court could not conclude that the Defendant had acted in self-defense.

Trial Court opinion, 6/19/98, at 3–4 (citation omitted). The trial court's verdict is more revealing of its reasoning:

I listened really carefully about the philosophy that he apologized to the whole group and because of the kids and to show them that's not the way to handle a problem by hitting somebody. So I guess the question for me is, factoring all the evidence that you presented about the defendant, the victim's visit to the house a couple nights beforehand, the arguments, what happened that day prior to this incident occurring, I listened to all the testimony with regard to the history of the argument.

Even Mrs. Witherspoon testified her husband apologized. I don't know if she was there. She testified to that. One of the things she said when she testified is she remembered the victim standing there pointing with one hand and the hand in the pocket with the other. I don't recall her testifying as being afraid. My impression was this guy was really wired, he calls him out and then he's running away and jumping off the porch instead of to confront him and he's backing off. In fact, he jumps in the truck and drived [sic] away so the impression that I had, quite frankly, from the victim testifying as well as this description of what happened that night at the house is this guy is, you know, got big muscles when it comes to talking but if you actually said, okay, let's do it, he backs off. That's the impression I got from the victim. . . .

Justification, what I have to determine in deciding whether or not the Commonwealth has failed to disprove the defense of justification, is what were the circumstances that existed before known to this Defendant at the time when this incident occurred. Yes, I heard him testify about the fact that he was shot in the chest and left for bleeding but we don't have a situation here where he's ever been threatened with a gun.

Although you brought up an incident with the victim being involved with the gun,[1] there was no testimony of an allegation of a weapon or anything that would place this particular Defendant in fear other than a lot of arguing and coming around and pounding on the door and getting in people's faces but nothing actually physical happening.

In fact, it sounds as though every time your client got close the victim chickened out and ran away. What are we facing that day? We're facing a situation where you've got four individual people who are not involved, they are mutual parties. You've got Murphy, you've got Baker and this Sutan person, that's why I wanted to know how far everything was he and what was happening just before this. Saldivar definitely was afraid of this Defendant, I think the injury is consistent with him slapping or hitting with an open hand on the jaw.

The question is what was happening at the time he actually reached out and slapped him. My concern with how your description of how they were acting, they did not perceive him as a threat. They would have all be present for this, even if the fact there was arguing going on prior to that. My perception of the way your client described what was going on was that they were

---

1. Saldivar admitted on cross-examination that he had charges pending against him for assaulting his wife:

> Q: Do you currently have charges pending for pulling a gun on your wife?
> A: Well I'm innocent until proven guilty.
> Q: You don't dispute that? The question is do you currently have charges against you for pointing a gun at your wife? I'm asking you if you're charged with that, sir?
> A: Not pulling a gun on my wife, no.
> Q: Assaulting your wife?
> A: That's what I'm accused of.
> Q: You're not accused of pulling a gun on her?
> A: There's supposedly a gun involved but no gun was found. No gun was found.

N.T. 12/29/97, at 29.

not fearing him even if he supposedly approached him.

So based on that description being given by your own client, I don't believe your client was reasonably in fear of his life. Specially in light of the statements he made about resolving problems and, as he said, it defeats the purpose to train kids if you show them that's the way to handle problems, I don't believe that. There was more than one person who could have intervened if Mr. Saldivar was coming at him in an aggressive manner. There was two other people that would have been between him and the defendant to have stopped it if he, in fact, were coming at him that way.

I don't totally believe – I don't believe his back was toward your client. I don't believe that factual scenario at all. I don't believe the defense of justification. I would find your client guilty beyond a reasonable doubt guilty of simple assault.

N.T. 12/29/97, at 83–85. We believe the trial court applied the wrong law to the facts of this case.

¶ 9 The trial court relied on *Commonwealth v. Dinkins*, 272 Pa.Super. 387, 416 A.2d 94 (1979), for the proposition that appellant had to reasonably believe he was in danger of death or serious bodily injury before the defense of justification would be available to him. However, as appellant points out, *Dinkins* is a case that deals with the justified use of deadly force as a self-defense. That is not the case before us. Here, appellant was charged only with simple assault and harassment; the alleged assault did not involve the use of deadly force. Therefore, the trial court's reliance on *Dinkins* was misplaced.

■ ¶ 10 The correct rule to apply in this case is that set forth by our Supreme Court in *Commonwealth v. Pollino*, 503 Pa. 23, 467 A.2d 1298 (1983):

This is not a case involving deadly force.... This case involves a mere battery, and in such cases, force may be met with force so long as it is only force enough to repel the attack.

*Id.* at 1301. 18 Pa.C.S.A. § 505 states:

(a) **Use of force justifiable for protection of the person.**—The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

We have not previously addressed what level of force is justifiable when repelling an attack by an unarmed assailant. We have, though, examined what level of force is *not* justifiable in repelling an attack. *See, e.g., Commonwealth v. Cutts*, 281 Pa.Super. 110, 421 A.2d 1172 (1980) (use of "shiny instrument" capable of slashing is excessive force applied against person who poked defendant with sharp stick); *Commonwealth v. Jones*, 231 Pa.Super. 300, 332 A.2d 464 (1974) (use of pocket knife against kicking and pushing assailants is excessive force). Each of these incidents involve the use of a deadly weapon against a relatively unarmed assailant. Such is not the case here.

■ ¶ 11 The testimony shows that Saldivar was, in the words of the trial court, a "wired" individual: confrontational, quarrelsome and querulous. Here, Witherspoon had been subjected to continuing challenges to fight from Saldivar for a number of days, each provocation being an escalation of the previous one. Still, Witherspoon kept himself in check. The immediate incident was precipitated when Saldivar was being physically escorted from the building; he broke free of his escort and lunged at Witherspoon with balled fists. Applying the correct law to this case, we find that it was not necessary for Witherspoon to be in fear for his life before he could resort to force to defend himself. Witherspoon was justified in meeting Saldivar's threat of force with the use of a similar level of force.

¶ 12 Witherspoon slapped Saldivar. We cannot say what response might have been

more appropriate, given the facts, circumstances and events as found by the court, but we do not find the force Witherspoon used was excessive.

¶ 13 Judgment of sentence reversed. Jurisdiction relinquished.