J-S52011-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.A.D.-B., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.A.D.-B., A MINOR | No. 195 MDA 2018 |

Appeal from the Dispositional Order Entered January 9, 2018
In the Court of Common Pleas of Centre County
Juvenile Division at No(s): CP-14-JV-0000070-2017

BEFORE: BENDER, P.J.E., MCLAUGHLIN, J., and STRASSBURGER,[*]

MEMORANDUM BY BENDER, P.J.E.:         **FILED OCTOBER 22, 2018**

Appellant, J.A.D.-B., a minor, appeals from the dispositional order entered on January 9, 2018, after he was adjudicated delinquent of aggravated assault, simple assault, and recklessly endangering another person. We affirm.

Briefly, Appellant's adjudication of delinquency stemmed from an altercation between Appellant and another juvenile, J.F., during which Appellant shot J.F. six times with a BB gun. The pellets struck J.F. in the chest, cheek, temple, and right eye, causing him severe injuries including permanent loss of vision in his right eye. After hearings conducted on December 13, 2017, and January 5, 2018, the juvenile court adjudicated Appellant delinquent of the above-stated offenses. At a dispositional hearing

_____

[*] Retired Senior Judge assigned to the Superior Court.

held on January 5, 2018, the court ordered that Appellant be placed in George Junior Republic Diagnostic Program.[1]

Appellant filed a timely notice of appeal, and he also timely complied with the juvenile court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On May 2, 2018, the court issued a Rule 1925(a) opinion. Herein, Appellant presents the following two issues for our review:

I.    Did the [juvenile] [c]ourt improperly find that [Appellant] did not act in self-defense before adjudicating him delinquent of the offenses of [a]ggravated and [s]imple assault?

II.   Did the [juvenile] [c]ourt abuse it's [*sic*] discretion by placing the juvenile at George [Junior] Republic Diagnostic Program, rather than continuing him on the least restrictive alternative of remaining with his family on either [the] Electronic Monitoring Program, or on Probation[,] where he had done well for over two months?

Appellant's Brief at 7.

Preliminarily, we note that "[t]he Juvenile Act grants broad discretion to juvenile courts, and we will not disturb the lower court's disposition absent a manifest abuse of discretion." **In Interest of N.C.**, 171 A.3d 275, 280 (Pa. Super. 2017) (citing **In re C.A.G.**, 89 A.3d 704, 709 (Pa. Super. 2014), and **In the Interest of J.D.**, 798 A.2d 210, 213 (Pa. Super. 2002)).

Here, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have reviewed the thorough and

---

[1] Appellant was evaluated in that program, and after the court conducted another hearing on April 6, 2018, it issued an order placing Appellant in George Junior's Special Needs Program.

articulate opinion of the Honorable Katherine V. Oliver of the Court of Common Pleas of Centre County. We conclude that Judge Oliver's extensive, well-reasoned opinion accurately disposes of the issues presented by Appellant. Accordingly, we adopt Judge Oliver's opinion as our own and affirm the dispositional order on that basis.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/22/2018



# IN THE COURT OF COMMON PLEAS, CENTRE COUNTY, PENNSYLVANIA
## JUVENILE DIVISION

IN THE INTEREST OF:

J.A.D.B.                                   CP-14-JV-70-2017

*Attorney for the Commonwealth:*          *Amanda Chaplain, Esq.*
*Attorney for the Defendant:*             *Parvis Ansari, Esq.*

Oliver, J.

## 1925(a) OPINION

After hearings conducted on December 13, 2017 and January 5, 2018, Juvenile J.A.D.B. was adjudicated delinquent on charges of aggravated assault, 18 Pa.C.S.A. § 2702(a)(1), simple assault, 18 Pa.C.S.A. § 2701(a)(1) and 2701(a)(3), and recklessly endangering another person, 18 Pa.C.S.A. § 2705. Following a disposition hearing on January 5, 2018, the Court determined that placement at George Junior Republic was the least restrictive placement both consistent with the protection of the public and best suited to J.A.D.B.'s treatment, supervision, rehabilitation and welfare. The Court entered an adjudication and dispositional Order that same date.[1]

J.A.D.B. filed a Notice of Appeal to the Superior Court on January 26, 2018. The Court issued an Order directing J.A.D.B. to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). J.A.D.B. filed a timely 1925(b) statement on February 16, 2018. The Court issues this opinion in accordance with Pa.R.A.P. 1925(a).

---

[1] The Court's January 5, 2018 Order, (filed of record January 8, 2018), directed placement at George Junior Republic's Diagnostic Program, which the Court concluded was necessary as an initial step for appropriate evaluation and assessment to determine the most appropriate program at George Junior Republic for J.A.D.B. That Order was amended to change the placement date to January 9, 2018. The evaluation and assessment was subsequently completed, and a hearing was held on April 6, 2018, at which time the Court entered an Order designating placement in George Junior's Special Needs Program.

☐ O ☐ RD ▌ S

In his 1925(b) statement, J.A.D.B. challenges the Court's rejection of his self-defense argument in adjudicating J.A.D.B. delinquent on the aggravated assault and simple assault charges. In addition, J.A.D.B. contends the Court abused its discretion by placing him at George Junior Republic rather than ordering that he remain in the care of his family on electronic monitoring or standard probation. These issues are addressed below.

Delinquency Adjudication on Assault Charges

J.A.D.B. challenges the Court's determination of delinquency as to the assault charges in this case. A person who attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another commits the crime of simple assault. *See* 18 Pa. C.S.A. § 2701(a)(1); *Commonwealth v. Torres*, 766 A.2d 342, 344 (Pa. 2001). Simple assault is also committed when an actor attempts through physical menace to put another person in fear of imminent serious bodily injury. 18 Pa. C.S.A. § 2701(a)(3). Under the Crimes Code, a person is guilty of aggravated assault when he:

> (1) attempts to cause serious bodily injury to another, or causes
> such injury intentionally, knowingly or recklessly under
> circumstances manifesting extreme indifference to the value of
> human life . . .

18 Pa. C.S.A. § 2702(a)(1).

An actor may avoid criminal liability for assault by application of the defense of justification, or self-defense, when there is sufficient evidence to justify a finding of self-defense. *See Torres, supra,* at 345. The affirmative defense of self-defense is codified in section 505 of the Crimes Code. *See* 18 Pa.C.S.A. § 505. Under section 505, the use of force toward another person is justifiable "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *Id.* The use of excessive force, however, is not justifiable in the eyes of the

2

law. *See e.g., Commonwealth v. Cutts*, 421 A.2d 1172 (Pa. Super. 1980); *Commonwealth v. Jones*, 332 A.2d 464 (Pa. Super. 1974). *See also Commonwealth v. Witherspoon*, 730 A.2d 496, 499 (Pa. Super. 1999) (in mere battery cases, "force may be met with force so long as it is only force enough to repel the attack")(quoting *Commonwealth v. Pollini*, 467 A.2d 1298 (Pa. 1983)). When self-defense is asserted by a defendant, the Commonwealth bears the burden of disproving the defense beyond a reasonable doubt. *Commonwealth v. Torres*, 766 A.2d at 345.

In the case at bar, the Court determined that J.A.D.B. sufficiently raised the issue of self-defense, or justification, to place the defense at issue. On consideration of the evidence, overall, however, the Court concluded that the Commonwealth met its burden of proving, beyond a reasonable doubt, that J.A.D.B. had committed the delinquent acts charged.

The incident giving rise to this case occurred on October 13, 2017. On that date, J.A.D.B. shot the victim, J.F., six times at close range with a BB gun, hitting him in the chest, cheek, temple and right eye. (*See* Tr. Adj. Hr'g., Dec. 13, 2017, at 7-20). The shooting incident occurred in the street near a high school football stadium crowded with students, parents, security officers and others while the football game was taking place. Both J.A.D.B. and J.F. were attending the football game that evening, although not together. J.F. was seriously injured as a result of being shot. Among other injuries, J.F. suffered permanent loss of vision in his right eye, and testimony established that he could eventually lose the eye altogether. (*Id.* at 26-29).

At the time of the incident, J.A.D.B. and J.F. were acquaintances, and had engaged in consensual boxing or wrestling-type activities after a high school football game on another occasion about two weeks before. The evidence also established that, earlier on the evening of the shooting incident, J.F. asked J.A.D.B. if he wanted to engage in consensual fighting, and J.A.D.B. said no and walked away. J.F. believed J.A.D.B. made some remark as he walked

away to the effect that something would happen later, although his testimony on that point was not clear. (*Id.* at 31-33). J.F. testified he later learned that J.A.D.B. was mad at him, so he went to find him to talk to him. (*Id.* at 8-9, 33-34). On finding J.A.D.B. in a parking lot not far from the football stadium, J.F. tried to talk to him, but J.A.D.B. cut him off, claiming that J.F. had called him names and asking if he wanted to fight him. J.F. denied the name calling and said he did not want to fight. J.F. testified that J.A.D.B. appeared angry during this exchange, and that J.A.D.B. lifted his sweatshirt and pointed to his waistband, as if he was concealing something there. (*Id.* at 9-11, 33-34). J.F. could not see whether J.A.D.B., in fact, had anything in his waistband, but he felt threatened and nervous. (*Id.* at 10).

J.F. testified that J.A.D.B. took a step or two away, and then stepped toward him and grabbed a gold chain J.F. was wearing, ripping it off of his neck. (*Id.* at 10). J.A.D.B. started running with the necklace in his hand. J.F., agitated, took a few steps after him, and J.A.D.B. started shooting him with the BB gun, first in the chest, and then in the face. (*Id.* at 16-18, 35-36). J.F. estimated he was one to two feet from J.A.D.B. when the first shot struck him. He was shot six times. Because he was slowed by the bullets, he estimated he was approximately five to six feet from J.A.D.B. when he was struck in the eye. J.A.D.B. ran off after firing the shots. (*Id.* at 14). J.F. testified that another friend, over the age of eighteen, was with him when he initially approached J.A.D.B. Although there were other people around, he had not noticed anyone else beside him because he was not paying attention to them. (*Id.* at 19).

J.A.D.B. testified to a different account of the events immediately before the shooting. According to J.A.D.B., J.F. approached him with a group of other kids and J.F.'s adult friend, and an argument between J.A.D.B. and J.F. ensued. (*See* Tr. Adj. Hr'g., Dec. 13, 2017, at 87-88). J.A.D.B. testified that J.F. started moving closer to him, calling him vulgar names. J.F. got

close to his face, and J.A.D.B. pushed him back, asking him to back up and saying he had a BB gun. (*Id.* at 88). According to J.A.D.B., J.F. looked at his older friend and then pushed J.A.D.B., and it was at that point that J.A.D.B. pulled the chain off J.F.'s neck. He testified that J.F. then cocked his hand back and ran after him, and it was then that J.A.D.B. fired the first shot. (*Id.* at 88-89). According to J.A.D.B., J.F. stopped completely for a moment after the first shot was fired, and then ran full speed at J.A.D.B. J.A.D.B. contends he backed up and fired the remaining five shots, although he says he did not even know how many shots he fired until he was told about it later. (*Id.* at 90). J.A.D.B. had "Snap Chat" communication with two friends fairly immediately after the shooting, stating he had done something bad and regretted it, and making various references to suicide as a means of getting himself out of the situation. (*Id.* at 57-61).

Counsel for J.A.D.B. elicited testimony from J.F. regarding two incidents in which J.F. was involved in fighting with a friend of J.A.D.B.'s, arguing that J.A.D.B.'s awareness of these incidents bolstered his argument that J.A.D.B. was afraid of J.F. and was justified in repeatedly shooting him with the BB gun on the night of the incident. (*Id.* at 36-42). There was also testimony that J.F. had a reputation for bullying. (*Id.* at 81-83).

The Court found J.F.'s testimony regarding the events of the night in question credible. By contrast, there were various inconsistencies in J.A.D.B.'s testimony about the sequence of events that made his theory that J.F. was the aggressor in the situation, and that his own actions were defensive in nature, difficult to accept. For example, J.A.D.B.'s testimony regarding who initiated the pushing changed throughout the course of even his direct testimony. (*See id.* at 88). In addition, although J.A.D.B. initially testified that J.F. pushed him before J.D.B.A. fired the first shot, (*id.* at 88-89), he later stated that J.F. had not touched him before he shot J.F. (*Id.* at

Appendix D-4

97). He subsequently stated a second time that J.F. pushed him first and he retaliated. (*See id.* at 97-98). In connection with that testimony, J.A.D.B. added, for the first time, that J.F. told him he was going to beat him up. (*Id.* at 98.) J.A.D.B. testified that he was not afraid of J.F. that evening, but that he did feel intimidated. (*Id.* at 97-99).

Given the overall credibility of both witnesses' testimony, and the inconsistencies in J.A.D.B.'s testimony, the Court accepted the testimony of J.F., and not the account given by J.A.D.B., as to how the events unfolded on October 13, 2017. In addition, and perhaps more significantly to the issue at hand, the Court concluded that J.A.D.B.'s use of the BB gun, and his shooting J.F. six times with the gun at close range was excessive force under the circumstances in any event, and thus, was not justified. Accordingly, the Court concluded that the Commonwealth met its burden of disproving the justification theory and proving its case beyond a reasonable doubt. The Court believes this conclusion was appropriate based on the evidence presented and the relative credibility of the testimony.

Disposition – Out-of-home placement

In determining the disposition for a delinquent juvenile, courts must consider the protection of the public interest and the juvenile's needs in terms of treatment, rehabilitation, supervision and welfare. *See* 42 Pa. C.S.A. § 6352(a). The disposition must be tailored to the individual circumstances of the case, and must provide "balanced attention to the protection of the community, the imposition of accountability for the offenses committed and the development of competencies" so the juvenile can become a responsible and productive community member. *Id.* Among the many disposition alternatives, the court may make a disposition order that commits the juvenile to out-of-home placement, provided that such an alternative is found to be the least restrictive alternative consistent with the protection of the public, the imposition of

6

accountability and the rehabilitative needs of the juvenile. *Id.* § 6352(a)(3); *see also* 42 Pa.C.S. § 6301.

In the case at bar, the Court held a disposition hearing on January 5, 2018. (*See* Tr. Disp. Hr'g., Jan. 5, 2018). In addition to the record as developed at the adjudication hearing, the Court had the benefit of a juvenile assessment report, ("JAR"), prepared by the Centre County Probation and Parole Department, and testimony was presented by J.F., J.F.'s mother, J.A.D.B.'s mother, and a representative from Family Intervention Crisis Services, a family service agency that has worked with J.A.D.B.'s family providing services beginning approximately eight months before the incident giving rise to this matter. (*Id.*). The JAR score overall is listed as "moderate," with the risk level in the categories of family circumstances/home environment, education, peer relations, leisure/recreation, personality/behavior, and attitudes/orientation all listed as "moderate." The JAR identified psychological and/or psychiatric needs that were not being fully addressed or met. In addition, by J.A.D.B.'s own report, he struggles with how to deal with frustration, and reacts physically to frustration.[2] Significant concerns regarding J.A.D.B.'s decision-making, problem solving skills, lack of supervision, academic underachievement and peer relation issues were all identified in the JAR.

Based on the information in the JAR and the testimony and statements at the disposition hearing, and also on the evidence pertaining to the assault at issue (including the fact that J.A.D.B., a 14 year-old child, was at a high school football game without any supervision and carrying a BB gun), the Court determined that J.A.D.B. is lacking supervision needed for his healthy, appropriate growth and development, as well as for his overall emotional and physical wellbeing, and that the lack of supervision is harmful to his best interests and poses a danger to the community. The Court also concluded that neither J.A.D.B. nor his family appreciate the

---

[2] The Court found this to be demonstrated by J.A.D.B.'s conduct on the night of October 13, 2017.

Appendix D-6

seriousness of J.A.D.B.'s delinquent acts and the gravity of the harm caused by his conduct. Further, although there was some expression of remorse, J.A.D.B. has not acknowledged or accepted accountability for his actions or demonstrated any understanding of his ability to control the choices he makes.

The Court further notes that, while on electronic monitoring awaiting his adjudication hearing, J.A.D.B.'s mother took him out of the county to visit family in Philadelphia without first obtaining permission from the juvenile probation department, despite the fact that such permission was required as a condition of the electronic monitoring program. Although these circumstances are not attributable to J.A.D.B.'s conduct and choices, they speak to the supervision deficiency, the failure of the family to appreciate the gravity of the present circumstances and J.A.D.B.'s needs, and a present inability to provide needed guidance, structure and supervision required for J.A.D.B.'s development of skills to help him become a productive member of the community and avoid further delinquent behavior.

In addition to the above, at the disposition hearing, the Commonwealth presented summary information for the benefit of the Court and J.A.D.B. and his family regarding the programs and services offered at George Junior Republic. In addition to services that include assessment and treatment/services for medical, psychiatric and psychological, social, behavioral, and educational needs, George Junior Republic encourages regular contact and communication between youth and family members and promotes reunification of families through regular contact and visitation and family therapy when appropriate. (*Id.* at 11-13).

Given all of these factors, the Court concluded that in-home supervision, whether on electronic monitoring or on standard probation, would not be consistent with either J.A.D.B.'s needs or the protection of the community at this time. The Court further determined that the

8        Appendix D-7

services available at George Junior Republic are well matched to J.A.D.B.'s treatment and rehabilitation needs and will promote family participation, thereby enhancing the likelihood of enduring success for J.A.D.B. Accordingly, the Court found that placement in George Junior Republic is the least restrictive alternative consistent with the protection of the public, with the imposition of accountability, and with J.A.D.B.'s rehabilitative needs. The Court's reasons for the disposition were summarized on record at the January 5, 2018 disposition hearing. (*See id.* at 48-57).

BY THE COURT:

Date: /*May 2, 2018*

Katherine V. Oliver, Judge